**Lavina M. RIGGEN, Respondent,**

v.

**PARIS PRINTING COMPANY and the Travelers Insurance Company, Appellants.**

**No. 29281.**

Missouri Court of Appeals, Kansas City District.

Dec. 5, 1977.

Gary E. Lowe, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, for appellants.

Ward B. Stuckey, Kansas City, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal by employer and insurer from judgment in affirmance of an award of compensation to employee by the Industrial Commission. The dispositive question is whether the employee's injury arose out of and in the course or scope of the employment. Reversed.

On March 15, 1973, Lavina M. Riggen lived near Liberty, Missouri, and was an employee of Paris Printing Company, 401 East 22nd Street, Kansas City, Missouri. She had been so employed since May, 1972, as "a bookbinder in shipping in a one girl shop." Her job was to "gather books in certain shipments, sometimes you run them on the machine for stitching and wrapped them, and shipped them." Her immediate supervisor was John Frye, whose supervisor was plant superintendent Wes Frentrop,

who was under Homer Paris, founder of the company, and his son, Gene Paris. Paris Printing Company was a union shop and Mrs. Riggen was a member of the bookbinders' union. Her regular hours were the same as those of the plant, from 7:30 a. m. to 3:30 p. m.

On March 15, 1973, Mrs. Riggen arrived at work around 5:45 a. m. She always went to work early because she "didn't like crossing the Paseo Bridge." She commenced working· "wrapping packages and getting them ready for our one driver that comes in and always goes out first * * *. He * * * came around seven and I wanted to get them ready." She completed this job and before she could get some other finished jobs "written up," "Wes Frentrop and Mr. Gene Paris and the group came back and said, let's go down to breakfast, that we are late now, and I said I would like to finish so I could get it written up, and they said, you can finish it when you get back." The subject of the foregoing was the annual Kiwanis benefit breakfast at Municipal Auditorium. She "didn't know what it was about, I know that they [Paris Printing, Mr. Homer Paris] were sponsoring it. * * * Mr. Frye had mentioned it the day before * * *. He didn't say whether he was going or what. * * * Somebody mentioned something about tickets, and I believe it was Gene said that Dad is down there and he has the tickets. * * * I just pushed the table over and went and got my purse, they were waiting for me, I got my purse and went with them. * * * They were turning them [lights] out over the presses, the pressmen weren't running the presses * * * but they were around * * *. We got in the station wagon [driven by Jim Weisher, a salesman] and went downtown and parked. I walked down about half a block and stepped off the curb, and got about half way from the curb and turned my ankle and fell." She was taken in the station wagon to St. Mary's Hospital by Mr. Weisher and Jim Brooks, "the two that went up with me, and shortly afterwards Mr. Gene Paris came and these salesmen came up to the hospital." She was found to have sustained a severe break in her ankle which called for three hospitalizations and surgeries over the succeeding months.

With respect to the breakfast event, Mrs. Riggen stated, "They didn't order me. I had the impression that I should, I mean everybody else was going, and they stood and waited, and if I had stayed I would have been the only one left in the plant." There was no discussion about pay in relation to attendance; if she had not gone to the breakfast, she would have continued with her work. She knew where the "group" was going by the invitation, "Let's go to breakfast." She knew that Mr. Homer Paris was involved to the extent of serving the pancakes that morning and said "[T]his I have to see."

The Paris plant operated on a "pretty formal" chain of command and her orders, whether oral or written, were "all in the * * * bookbinding work, in the printing work." She credited both Gene Paris and Wes Frentrop with authority to hire or fire her. When she came to work early, she got off early unless something had to go out, in which case she stayed on, got it out, and was paid overtime.

Mr. Riggen called Mr. Homer Paris about her medical bills to determine whether she should turn them in to Graphic Arts, her group health insurance through the bookbinders' union, or Workmen's Compensation, and he advised her to give the Graphic Arts number.

An advertisement of the Kiwanis Pancake Day had been placed by the coffee machine sometime before the event which indicated its time as "7 a. m. till 8 p. m." and also indicated, see "H. E. Paris for free ticket." Mrs. Riggen was aware that her group left for the breakfast in time to return before the plant opened at its regular time of 7:30 a. m.

With respect to pressures, if any, brought on her to attend the breakfast, Mrs. Riggen was asked and answered:

"Q [by Mr. Lowe for Appellants] Now did anyone, and I am speaking of Mr. Frentrop, or Mr. Paris, or Mr. Fry, or any other

person in any way pressure you, or indicate that you should go or you were expected to go to the pancake breakfast? A I felt I was expected to go, they were, they came, everybody at the plant at that time came through and they stood there and waited and I— Q The business hadn't started for any of them, had it? A Not to my knowledge. I don't know if they were working up in the plate room, I don't know what they were doing up there. Q You have indicated that everybody that was in the plant did go to the breakfast including yourself. A Yes. Q But you don't know whether anyone had started work other than yourself? A No, I don't. * * *

"Q They in no way attempted to regulate your social life, did they? A No. Q They didn't tell you where or when to eat lunch, or when and where to have dinner, or anything like that, did they? A No. Q So you are not trying to imply, I am certain, Mrs. Riggen, that because there was a suggestion that you go and have breakfast an hour and fifteen minutes prior to the plant even opening up that this was considered by you to have been an order from anyone, were you? A Well, at least— Q Are you trying to say that? A No, I wasn't ordered to go. Q Wasn't this just a group of people, anywhere from twenty-five to thirty-five per cent of the employees at your company that went down to have pancakes at the Kiwanis Pancake Breakfast, isn't that a fact, an hour and fifteen minutes before work began? A Yes.

"Q Now your job as a bookbinder, or at least in the bookbinding area, I believe you called it a one girl shop? A Yes. Q You were kind of a Jill-of-all-trades, I guess, in respect to that type of work. Did you have any contact with the public in your type of work? A Yes. Q What type of contact did you have? Was it there at the plant? A No, not always, sometimes it was over the telephone about a job. Q You didn't do any sales work, though, or go out and get accounts, or try to get jobs, or any type of bids for Paris Printing? A No. Q So if you would have gone to the breakfast that morning and been successful and arrived in good shape you wouldn't have been doing

any, shall we say job seeking that day for Paris Printing Company, would you? A No. Q You certainly didn't take any jobs with you? A No. Q So you weren't doing any work at that time when you went to the breakfast? A No.

"Q Did you feel in any way that you would have been fired, or disciplined or chastised, or thought badly of by anybody at Paris Printing Company if you had not gone to the breakfast that day? A I don't know. Q Well, did you feel that? Whatever you feel, what you felt at that time, whatever you feel now? A I don't really know. Q But you did consider it an order to go? A No, they didn't order me to go. * * *

"Q [By Mr. Stuckey for Respondent] Mrs. Riggen, when Gene Paris or Wes Frentrop while you were on the premises of the Paris Printing Company made a reasonable request of you was it your custom to follow those requests? A Yes, definitely. Q Did you consider both of the people the boss? A Yes, I did. Q Did they have to give a specific order to you to get you to do something? A No. * * *

"Q [By Mr. Lowe] But my point is, Mr. Stuckey referred to this as being a reasonable request, which it may well have been, or a suggestion, whatever it in fact was, but you were not required to do this, it was not put to you as an order, was it? A No, it wasn't. Q So in fact it was your own time, and you could have gone or not gone, couldn't you? A Yes.

"Q And if they had asked you to do something similar to this on your own time at four thirty in the afternoon you could have gone, or not gone, couldn't you? A Yes.

"Q But, in fact, if they had asked you to do something between seven forty-five in the morning and three thirty in the afternoon, your union contract hours pertaining to your job with respect to shipping, with respect to bookbinding, then you would have accepted that suggestion or request, would you not? A Yes, I would. Q Because that pertained to your job? A Yes.

Q But, in fact, going to breakfast really didn't pertain to your job, did it? A No.
* * *

"Q [By Mr. Stuckey] Again, Mrs. Riggen, did you consider it part of your working days to accept a suggestion that you go to breakfast, whether it would have been at Kiwanis, or at Winstead, or Sidney's, did you consider that part of your job? A It wasn't my job, no that wasn't my line of work. Q Pardon me. A That wasn't my line of work. Q Eating breakfast wasn't considered to be part of your line of work, although we all have to do it, right? A Right. Q This was just a social engagement, wasn't it? A Yes."

Homer Paris, Jr., was Chairman of the Board of Paris Printing Company, a small family business. He is actively engaged in Downtown Kiwanis Club and its annual pancake breakfast and, in this case, the breakfast of March 15, 1973. He and his son recognized service clubs as a means to expose their business to other businessmen and the general public. He did not know whether Gene or Mr. Frentrop asked or ordered any of the Paris employees to go to the breakfast; and he was unaware which, if any, employers have their people in attendance. His company purchased approximately twenty-five tickets each year which were available free to plant employees who would like to go. There was no attendance requirement.

Homer Eugene Paris, III (Gene), was president of the company. He, too, acknowledged that activity in service clubs, he in Cosmopolitan, was a device that the company used to expose itself to the public, and that his father's activity in Kiwanis was utilized to meet other businessmen. There was no pressure on any employee to attend the breakfast, he knew of no such pressure applied to Mrs. Riggen, and he and Wes Frentrop and the others in "the group" went because they had free tickets for the breakfast; it was only a social gathering and free breakfast.

Wesley Frentrop conducted himself informally on the job and did not order people around. He did not exert any pressure on Mrs. Riggen to go to the free breakfast. When he said, "Come on Vi, let's go," she joined the group that headed for the breakfast. "We left the shop early enough to get down to eat and get back by starting time." All of the company's employees were invited to attend each year. Six or seven went the year in question.

The question, now recast, is whether an employee, en route to an annual benefit pancake breakfast, sponsored in part and encouraged by the employer, and to which all employees are invited but not compelled to attend, and at a time when the employer's business is not open and its plant is down, slips and falls and sustains an injury on a public street leading to the place where the breakfast is being served, can look to the employer for compensation on the theory that the accident arose out of and in the course of the employment. As stated in *Stout v. Sterling Aluminum Products Co.*, 213 S.W.2d 244, 246 (Mo.App.1948), the courts of Missouri have never gone so far in applying such liberal construction to the Workmen's Compensation Act.

The problem posed by Mrs. Riggen's claim for compensation is treated at length in Annotation: Workmen's Compensation: Injury Sustained While Attending Employer-Sponsored Social Affair As Arising Out Of And In The Course Of Employment, 47 A.L.R.3d 566, et seq. As there indicated, all the cases discussed appear to recognize that under appropriate circumstances an injury sustained by an employee while attending or traveling to or from an employer-sponsored social affair may arise out of the course of employment so as to be compensable under workmen's compensation.

The cases reveal that no general rule has been developed which can be applied to all situations for the determination of the circumstances under which the injury may be considered to have arisen out of and in the course of employment, with the result that the determination is made by the consideration of various relevant factors, accorded varying degrees of weight, applied to the particular facts and circumstances of each case. Inasmuch as injuries sustained

by an employee in connection with an employer-sponsored event usually occur while the employee is not performing the duties for which he was employed, the inquiry is whether the social affair is sufficiently related to the employment to justify the conclusion that the injury arose out of and in the course of employment. Whether an employee injured while attending or traveling to or from an employer-sponsored social affair was compelled, directly or indirectly to attend, whether the employer derived some benefit from his sponsorship of the function, the extent to which the employer sponsored, controlled, or participated in the activity, and whether the social affair was a benefit or consideration of the employment to which the employee was entitled, have been recognized as the primary elements to be considered in determining the compensability of the injury.

■ The presence or absence of any one factor is not necessarily determinative; but this generality is subject, perhaps, to one exception, that being the element of actual compulsion, which, standing alone, has been deemed sufficient to make an injury sustained in connection with the affair compensable. In such situation, the accident arises out of and in the course of the employment, because in attending the function, the employee is engaged in fulfilling the employer's requirements.

■ The statement shows that the operative facts are not disputed. Homer Paris, Jr., a member of the Downtown Kiwanis Club, participated with his fellow Kiwanians in conducting the annual Kiwanis Breakfast in the course of which he brought his company, Paris Printing, into sponsorship of the event. For purposes of this decision, it can be assumed that Paris Printing was the sponsor of the affair; that Mr. Paris and his company sponsored the affair for purposes of benefit to business interests. There is no evidence that attendance by Paris employees was any part of the anticipated benefit, or that the affair was a benefit or consideration of the employment of Mrs. Riggen or any other Paris employee. Nor is there any evidence of compulsion,

direct or indirect, upon Mrs. Riggen or any other employee to attend. To the contrary, she stated more than once that she was under no order to go, she would not have been disciplined for failure to attend, the breakfast was not in her line of work and was "just a social engagement." In such circumstances, the award that should be entered by the Industrial Commission becomes a question of law and the Commission's conclusions are not binding on the appellate court. *Corp v. Joplin Cement Co.,* 337 S.W.2d 252, 258[7] (Mo. banc 1960).

*Stout v. Sterling Aluminum Products Company,* supra, is analogous. Stout, the employee, attended the third annual picnic sponsored by Sterling for its employees. The plant was closed down and all employees and families were invited to attend and were given tickets for free food, refreshments, and carnival rides. The purpose of the annual picnic was to create good will and make fellowship among the employees. Upon leaving the picnic, the employee fell on steps leading to the bus line and injured his knee. An award of compensation was reversed because the benefits of the compensation statute cannot be extended within reason to include an injury at a social function sponsored by the employer, when the employee is under no compulsion to attend and suffers no penalty for failure to attend.

*Graves v. Central Electric Power Cooperative,* 306 S.W.2d 500 (Mo.1957), is consistent in its contrast. Graves, the employee, attended the annual picnic sponsored by the employer. All employees and their families were invited to attend, the picnic was free, attendance was optional, the picnic was for purposes of company harmony. On the day of the picnic, Graves was, in effect, ordered to attend to perform standby duty for benefit of the employer. While boating at the picnic, he drowned in an attempt to rescue his son. An award of compensation was affirmed because the accident arose out of the course of the employment in that the employee had been ordered to attend to be available for performance of duties in the scope of his employment. See also *Travel-*

*ers Insurance Co. v. Majersky,* 531 S.W.2d 765 (Mo.App.1975). Majersky, employed as editor of a newspaper, attended a Chamber of Commerce Awards banquet. He was asked to "cover" the event for the paper by its managing editor and the paper provided the ticket. During the dinner he became ill and subsequently succumbed from a condition known as "cafe coronary." An award of compensation was affirmed because the accident occurred within the scope of employment in that the employee was under direction to attend the function to get a story for his employer's newspaper.

Respondent would hold this award as a case of "mutual benefit," as in *Wamhoff v. Wagner Electric Corp.,* 354 Mo. 711, 190 S.W.2d 915 (banc 1945). The distinction of that case from the circumstances of Mrs. Riggen's claim is made in *Stout v. Sterling Aluminum Products Co.,* supra. The employee, Wamhoff, was engaged in plating, polishing, and buffing metals. While so engaged he also was polishing a toy for his daughter when his hand became caught and injured. The practice was encouraged by the employer as an aid to proficiency. The accident occurred during hours, at the place of employment, and while the employee-employer relationship existed. Thus, an accident in the course of employment.

Accordingly, in the absence of evidence to warrant the award of compensation, the judgment in affirmance of such award is, by force of Section 287.490.1(4), RSMo 1969, reversed.

All concur.